IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DAVID NASH,                                          Civil No. 04-6291-CO

         Plaintiff,                        FINDINGS AND RECOMMENDATION

  v.

KEN LEWIS; et al.,

         Defendants.


COONEY, Magistrate Judge:

      Plaintiff David Nash has filed a first amended complaint alleging claims

for violation of his civil rights and pendent state claims against defendants

arising out of his arrest and civil commitment.  Plaintiff seeks general and

compensatory damages, special damages, punitive damages, and an award

of reasonable attorney's fees and costs and disbursements.  This Court has

jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  Before the Court

are defendant Harris' amended motion for summary judgment (#116) and

defendant Mercy Medical Center's motion for summary judgment (#118),

which are opposed by plaintiff.

## I. <u>FACTS</u>

The Court makes the following findings of fact, construing the facts in the light most favorable to the non-movant:

On October 17, 2003, plaintiff was arrested by the Rogue River, Oregon, police and subsequently transported to Rogue Valley Medical Center for a psychiatric evaluation. (Compl. ¶¶ 28, 29; Am. Compl. ¶¶ 31, 32.)

Defendant Harris was employed as an emergency room physician at Rogue Valley Medical Center. (Harris Aff. ¶ 2.)

Defendant Harris was of the opinion that plaintiff was in need of care and treatment. (Harris Aff. ¶ 5.)

It was determined that plaintiff should be admitted to the mental ward of Rogue Valley Medical Center. Defendant Harris consulted with a second physician. (Harris Aff. ¶¶ 6, 7; Pl. Ex. 3 Wick Dep. 36, 38, 81; Nash Decl. ¶ 8; Pl. Ex. 6 Nash Dep. 170, 308.) Plaintiff was placed on a psychiatric hold at Rogue Valley Medical Center by defendant Harris.

Rogue Valley Medical Center did not have a secure and appropriate place to care for Mr. Nash, so he was transferred to Mercy Medical Center in Roseburg, Oregon. (First Am. Compl.; Mendelson Decl. ¶3 & Ex. A.)

Dr. Mendelson received a call from a Mercy Medical Center nurse on

October 19, 2003, reporting escalating behavior by Mr. Nash, including yelling, chanting, banging on the window, threatening staff, and writing on the walls. Dr. Mendelson gave medication orders on an as-needed basis. (Mendelson Decl. ¶ 4 & Ex. B; <u>See</u> Nash Decl. ¶¶ 16, 18-24, 26.)

Dr. Mendelson evaluated Mr. Nash in person on October 20, 2003, and diagnosed him with bipolar affective disorder mixed with psychotic features. (Mendelson  Decl. ¶ 5 & Ex. C.)   Bipolar affective disorder mixed with psychotic features is a DSM IV diagnosis.  (Mendelson Decl. ¶ 5 & Ex. C.)

Dr. Mendelson assessed Mr. Nash again on October 21 ,2003.  Dr. Mendelson's assessment was that Mr. Nash continued to have delusions that he was a stealth computer, and Dr. Mendelson diagnosed bipolar affective disorder I, mania with psychotic features.  (Mendelson Decl. ¶ 6 & Ex. D; Nash Decl. ¶ 35; Gordon Decl. ¶¶ 3-4; Bock Decl. ¶ 7.)

Rogue Valley Medical Center had appropriate space for Mr. Nash on October 21, 2003, and Dr. Mendelson deemed him safe for transport, so Mr. Nash was transferred back to Rogue Valley Medical Center on October 21,2003.  (Mendelson Decl. ¶ 6 & Ex. D.)

Dr. Mendelson is a physician licensed to practice in the state of Oregon, and a board certified psychiatrist.  (Mendelson Decl. ¶ 1.)  Dr. Mendelson is an employee of Mercy Medical Center, a private hospital.  Dr. Mendelson does

not have a contract with a government agency relevant to this lawsuit. (Mendelson Decl. ¶¶ 1, 7.)  Dr. Mendelson's medical and treatment decisions were based on his own professional judgment, and were not influenced by, or made in connection with, any governmental agency or body.  (Mendelson Decl. ¶ 7.)

## II.  <u>LEGAL STANDARDS</u>

A moving party is entitled to summary judgment as a matter of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact . . . ."  Fed. R. Civ. P. 56©); <u>Freeman v. Oakland Unified Sch. Dist.</u>, 291 F.3d 632, 636 (9th Cir. 2002).  The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact.  <u>Playboy Enters., Inc. v. Welles</u>, 279 F.3d 796, 800 (9th Cir. 2002).

The moving party must carry the initial burden of proof.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986).  The moving party meets this burden by identifying for the court portions of the record on file which demonstrate the absence of any genuine issue of material fact.  <u>Id.</u>; <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  In assessing whether a party has met its burden, the court views the evidence in the light most favorable

Findings and Recommendation - Page 4

to the non-moving party.  Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995).  All reasonable inferences are drawn in favor of the non-movant.  Gibson v. County of Washoe, 290 F.3d 1175, 1180 (9th Cir. 2002), cert. denied, 537 U.S. 1106 (2003).

If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts which show there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 & n.4 (1986).  If the moving party presents evidence which, taken by itself, would establish the right to a directed verdict at trial, the motion for summary judgment must be granted, in the absence of any significant probative evidence tending to support the opposing party's theory of the case.  THI-Hawaii, Inc. v. First Commerce Fin. Corp., 627 F.2d 991, 993-94 (9th Cir. 1980); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968).  Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial.  Devereaux, 263 F.3d at 1076.

### III. **DISCUSSION**

Plaintiff alleges a 42 U.S.C. § 1983 claim against defendant Mercy Medical Center and state tort claims of false imprisonment, battery, and malpractice against defendants Harris and Mercy Medical Center.

42 U.S.C. § 1983 Claim against defendant Mercy Medical Center

Defendant Mercy Medical Center (Mercy) contends that plaintiff's federal law claim for violation of 42 U.S.C. § 1983 does not apply to it because it and its staff, including Dr. Mendelson, were not state actors. Plaintiff responds that, as in the case of Jensen v. Lane County, 222 F.3d 570 (9th Cir. 2000), there is a complex series of arrangements between the State and Mercy by way of a detailed contract, such that a genuine issue of material fact precludes summary judgment as to his § 1983 claim against Mercy. Defendant Mercy replies that plaintiff ignores the "close nexus" requirement articulated in Jensen and, under plaintiff's analysis, every individual and entity who acts pursuant to ORS Chapter 426, would be considered a state actor, which has no basis in law.

To state a claim for relief under section 1983, "a plaintiff must allege facts which show a deprivation of a right, privilege or immunity secured by the Constitution or federal law by a person acting under color of state law." Lopez v. Dept. of Health Servs., 939 F.2d 881, 883 (9th Cir. 1991) (per curiam); Leer v. Murphy, 844 F.2d 628, 632-33 (9th Cir. 1988). The "under

color of state law" requirement is equivalent to "state action," that is, the

conduct allegedly causing the deprivation of a federal right must be fairly

attributable to the state.    Lugar v. Edmondson Oil Co., 457 U.S. 922, 928,

937 (1982).  The Ninth Circuit has held that,

> In order to be considered state action, when a private
> actor participates in a governmental act, the court must find a
> sufficiently close nexus between the state and the private actor
> "so that the action of the latter may be fairly treated as that of
> the State itself." Jackson v. Metropolitan Edison Co., 419 U.S.
> 345, 350 [] (1974). . . . The Court in Jackson clarified that the
> "State [must be] so far insinuated into a position of
> interdependence with the [private party] that it was a joint
> participant in the enterprise."  419 U.S. at 357-58 [].

Jensen v. Lane County, 222 F.3d 570, 575 (9th Cir. 2000).  However, detailed

regulation and funding for private actors are not sufficient to transform a

private party's conduct into state action.  Id; Rendell-Baker v. Kohn, 457 U.S.

830, 841 (1982) (citing Blum v. Yaretsky, 457 U.S. 991, 1007-08, 1009-10

(1982)); Chrisman v. Sisters of St. Joseph of Peace, 506 F.2d 308, 313 (9th

Cir. 1974) (and cases cited).

In support of his argument that defendant Mercy is a state actor,

plaintiff relies on a "detailed contract" between Mercy and the State, (Buchal

Decl. Ex. 9).  (Pl. Opp'n at 27.)  Plaintiff asserts that, due to the statutory and

regulatory scheme, it is clear that the holding and evaluating of persons

alleged to be mentally ill is a core state function as to which the State

Findings and Recommendation - Page 7

exercises a high degree of control, such that the State's involvement overrides the "'purely medical judgment'" rationale of <u>Blum</u>, 457 U.S. 991. (Pl. Opp'n (quoting <u>Jensen</u>, 222 F.3d at 575).)

The Ninth Circuit in <u>Jensen</u> found that the private party and the County through its employees had "undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others." <u>Jensen</u>, 222 F.3d at 575. There, the record showed that county employees initiated the evaluation process, there was significant consultation with and among the various mental health professionals, and the private group of psychiatrists who contracted with the private party helped to develop and maintain the mental health policies of the county psychiatric facility.

The <u>Jensen</u> court noted that courts have held that "mental health commitments do not constitute a function 'exclusively reserved to the State.'" <u>Jensen</u>, 222 F.3d at 574 (quoting <u>Okunieff v. Rosenberg</u>, 996 F. Supp. 343, 349 (S.D.N.Y. 1998), <u>aff'd</u>, 166 F.3d 507 (2d Cir. 1999) (collecting cases)). While plaintiff presents an "Acute Inpatient Psychiatric Agreement" between Douglas County and Mercy, (Buchal Decl. Ex. 9), plaintiff offers no evidence which shows any involvement by county employees in the evaluation process or evidence that Dr. Mendelson helped to develop and maintain the mental

health policies of Mercy, a private hospital, as was the case in Jensen. Plaintiff concedes he has no evidence of any direct involvement of Douglas County employees at Mercy. The undisputed evidence in the record is that Mercy is a private hospital; Dr. Mendelson does not have a contract with a government agency relevant to this lawsuit; and his medical and treatment decisions were based on his own professional judgment and were not influenced by, or made in connection with, any governmental agency or body. See Doe v. Harrison, 254 F. Supp.2d 338, 343-44 & n.1 (S.D.N.Y. 2003); see also Hendricks v. Rasmussen, No. Civ. 01-783 (DSD/JMM), 2001 WL 1631325, at *2-*3 (D. Minn. July 27, 2001), aff'd, 23 Fed. Appx. 639 (8th Cir. 2002) .

On this record, the Court finds that plaintiff fails to show that either Dr. Mendelson or defendant Mercy was a state actor when Dr. Mendelson treated plaintiff while plaintiff was detained at Mercy Medical Center. Defendant Mercy's motion for summary judgment on the ground that plaintiff's federal law claim for violation of 42 U.S.C. § 1983 does not apply to it because it and its staff were not state actors should be granted, and plaintiff's § 1983 claim against defendant Mercy Medical Center should be dismissed.

In a footnote in its motion, defendant Mercy asserts that, once the federal claim against it is dismissed, this court lacks subject matter jurisdiction over the state law claims alleged against it and the state law

claims should be dismissed.  Plaintiff does not address defendant's argument

in this regard.

28 U.S.C. § 1367 provides in pertinent part that:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.
. . . .
(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if --
(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are compelling reasons for declining jurisdiction.
. . . .

28 U.S.C. § 1367(a), (c).[1]

Here, the Court has original jurisdiction by virtue of the § 1983 claims

alleged against other defendants.  28 U.S.C. § 1331.  The Court finds in the

circumstances of this case that the state law claims alleged against Mercy

Medical Center are so related to claims over which the court has original

---

[1]  28 U.S.C. § 1367(b) is not applicable in this case.

Findings and Recommendation - Page 10

jurisdiction that the claims form part of the same case or controversy.  See 28 U.S.C. § 1367(a).     28 U.S.C. § 1367(a) provides that supplemental jurisdiction includes claims that involve the joinder of additional parties. Accordingly, in the circumstances, the Court has supplemental jurisdiction pursuant to § 1367(a).  Executive Software N. Am., Inc. v. U.S. Dist. Court, 24 F.3d 1545, 1555-56 (9th Cir. 1994) (§ 1367(a) "confers power to entertain supplemental jurisdiction in mandatory terms") (and cases cited).

Once it is determined that supplemental jurisdiction is permissible under § 1367(a), § 1367(c) provides the only valid bases upon which the court may decline jurisdiction.  Executive Software, 24 F.3d at 1551.  Because none of the exceptions set forth in §1367(c) apply in this case, see Executive Software, 24 F.3d at 1551 (and cases cited), there is no valid basis for the Court to decline jurisdiction over the state law claims alleged against defendant Mercy Medical Center.  Defendant Mercy Medical Center's motion for summary judgment on this ground should be denied.

State claims against defendants Harris and Mercy Medical Center

Defendants Harris and Mercy move for summary judgment as to the state claims against them on the ground that they are statutorily immune from liability pursuant to ORS 426.335.  Defendants also contend that they meet the applicable standard of care.  Plaintiff responds that genuine issues

Findings and Recommendation - Page 11

of material fact prevent summary judgment on immunity grounds. Defendants reply that plaintiff attempts to add a new requirement to the immunity statute—that a physician or hospital cannot be immune from liability unless they act in conformance with all state and federal laws concerning the care of allegedly mentally ill persons and civil commitments.

ORS 426.335, which allows for limitations on liability in certain circumstances, provides in pertinent part as follows:  "No physician, hospital or judge shall be held criminally or civilly liable for actions pursuant to ORS . . . 426.232 if the physician, hospital or judge acts in good faith, on probable cause and without malice."  ORS 426.335(5).  ORS § 426.232, referenced in ORS 426.335(5) which relates to emergency admission of dangerous person by physician, provides in relevant part:

> (1) When a physician licensed to practice medicine by the Board of Medical Examiners for the State of Oregon believes a person who is brought to a hospital or nonhospital facility by a peace officer under ORS 426.228, a person authorized under ORS 426.233 or a person who is at a hospital or nonhospital facility is dangerous to self or to any other person and is in need of emergency care or treatment for mental illness, the physician may do one of the following:
>> (a) After consulting with a physician or a qualified mental health professional, as defined by rule of the Department of Human Services, detain the person and cause the person to be admitted or, if the person is already admitted, cause the person to be retained in a hospital where the physician has admitting privileges or is on staff.
>> . . .

> (b) Approve the person for emergency care or treatment
> at a nonhospital facility approved by the department.

The parties and the Court have found no Oregon or Ninth Circuit case which discusses the immunity statute before the Court, or its predecessor, in any relevant way.  Plaintiff relies primarily on <u>Scovill ex rel. Hubbard v. City of Astoria</u>, 324 Or. 159 (1996), in support of his position.  Defendants rely on a second Oregon case, <u>Deming v. Mt. Hood Community Mental Health Center</u>, 128 Or. App. 164 (1994).

The Oregon Supreme Court's decision in <u>Scovill</u> is relevant to the threshold determination of whether either defendant may be eligible for immunity.  The <u>Scovill</u> court, citing <u>Portland General Electric Co. v. Bureau of Labor and Industries</u>, 317 Or. 606, 610 (1993), construed a statutory scheme which allowed immunity to police officers.  In <u>Scovill</u>, the first statute granted authority to police officers to act in certain situations and imposed a duty to act in certain other situations.  <u>Scovill</u>, 324 Or. at 166.  The second statute, using language similar to ORS § 426.335, the immunity statute at issue here, granted immunity for "actions pursuant to [the first statute] provided the actions are in good faith, on probable cause and without malice." <u>Scovill</u>, 324 Or. at 167-68.  The Oregon Supreme Court interpreted the pair of statutes literally and narrowly, without need to resort to legislative history or canons

of statutory construction.  Id. at 168.  The court stated:  "[The immunity] statute's provisions apply to 'actions' taken 'pursuant' to the authority granted or the duty imposed by the prior section, provided that the actor acts in good faith, without malice, and with probable cause."  Id. (emphasis omitted). The Scovill court stated, "What is striking about the protection provided by [the immunity statute] is how limited its scope actually is." Id.  Applicable to the facts of the case, the Scovill court held that, when a statutory duty to act arose, the language "actions pursuant to" provided immunity only when action was undertaken and not for a failure to act.  Id. at 168-69, 170.

As applicable to the circumstances of this case, under Scovill, ORS § 426.335(5) allows for immunity for actions taken "pursuant" to the authority granted by ORS § 426.232, provided the actor acts in good faith, on probable cause, and without malice.  Therefore, if a physician commits an individual prior to finding a person "dangerous" "and" "in need of emergency care or treatment," it would seem that the physician has not acted "pursuant to" ORS § 426.232; alternatively, a physician's failure to find either that a person is "dangerous" or "in need of emergency care"—both of which are required by ORS 426.232--would affect the determination, relevant here, whether the actor acted "on probable cause,"--which is a requisite to a finding of immunity

under ORS 426.335(5).[2]

Clearly, if the actor, in determining the requisite "dangerousness" and "need of emergency care," acts "in good faith, on probable cause and without malice," the actor would be immune from civil suit.  In Deming, 128 Or. App. at 168, an investigator was granted statutory immunity for "conducting the investigation" and the resulting consequences,  when none of the statutory conditions on the grant were in dispute.

The Court will first address defendant Harris' claim to immunity under ORS 426.335(5).  Defendant Harris argues in her reply brief, that she examined plaintiff; based on her examination, she believed that he was in need of emergency care or treatment for mental illness; she consulted with a second physician; she acknowledged that there needs to be a finding of dangerousness and believes there was such a finding; based on her examination, she had probable cause to believe he was in need of emergency care or treatment for mental illness; and she had a good faith belief that plaintiff was dangerous to himself or another person and needed emergency care or treatment, as evidenced in the medical records, her affidavit, and her deposition testimony.  She argues that "good faith" is a subjective, not an objective, standard, and plaintiff is incorrect in contending that she must

---

[2] Plaintiff does not contend that defendant Harris acted with malice.

prove objective good faith.  Plaintiff contends that numerous issues of fact prevent summary judgment in favor of defendant Harris on statutory immunity grounds.

Under ORS 426.232(1), a physician must "believe[]" that a person is both dangerous "and" is in need of emergency care or treatment for mental illness before the person can be detained and admitted to a hospital.  Here, it is undisputed that defendant Harris was of the opinion that plaintiff was in need of care and treatment.  In support of her motion, defendant Harris offers her affidavit, the only evidence she offers in support of her motion, in which she states in pertinent part that, "It was my opinion that after examining plaintiff, plaintiff was in need of emergency care or treatment for mental illness."[3]  (Harris Aff. ¶ 5.)  She also states in her affidavit that she consulted with a second physician who agreed that plaintiff should be admitted, and that plaintiff was admitted to the mental ward of Rogue Valley Medical Center.  (Harris Aff. ¶¶ 6-7.)  Notably, as to the element of dangerousness, defendant Harris offers no affirmative evidence that she believed plaintiff to be dangerous to himself or to another person before plaintiff was admitted.  Also, the Court notes that defendant Harris does not state in her affidavit that she acted in good faith, on probable cause, or

---

[3] Whether defendant Harris examined plaintiff is disputed by the parties, see infra.

Findings and Recommendation - Page 16

without malice.

In response to defendant's motion, plaintiff offers evidence which raises a question whether defendant Harris actually examined plaintiff before making her decision to retain him.  OAR 309-033-0250(3) requires that, in a hospital hold situation, "[o]nly a physician" "who has completed a face-to-face examination" of the individual may retain the person in the hospital "as provided by ORS 426.232."  Under the statutory and regulatory scheme, the physician's personal contact with the person through a face-to-face examination is required before the requisite findings of dangerousness and need for emergency care or treatment for mental illness is made and the person detained in the hospital or facility.

Plaintiff offers the testimony of defendant Lehman, the police officer who transported plaintiff to Rogue Valley Medical Center, who indicated by his testimony that the doctor who "came in" and "spent time" with plaintiff was a male doctor, (Buchal Decl. Ex. 5 Lehman Dep. At 26, 28, 62); he testified he believed he talked to a female doctor while he was standing by the door, who asked him what plaintiff was there for and then left, (Buchal Decl. Ex. 5 Lehman Dep. at 61-62).  Plaintiff also offers his own deposition testimony at which time he testified that he was "not absolutely sure " he met Dr. Harris, it was possible that he did, and "It would have been very, very

brief." (Buchal Decl. Ex. 6 Nath Dep. At 164, 305-06.)  He also offers his own declaration in which he states that, "Dr. Harris . . . did not examine me face-to-face."  (Nash Decl. ¶ 6.)[4]  The Court finds that this evidence raises a genuine issue as to whether defendant Harris completed a face-to-face examination of plaintiff before committing him.

Plaintiff also offers evidence which raises a question whether defendant Harris made a finding that plaintiff was dangerous to himself or others before committing him.  Plaintiff offers the deposition testimony of defendant Harris, in which she was questioned about any finding by her of plaintiff's dangerousness before he was admitted to the medical center.  He offers evidence that Defendant Harris testified that, "Mr. Nash was admitted because his mental status examination showed significant abnormalities." (Buchal Decl. Ex. 1 Harris Dep. at 76-77.)  Defendant Harris further testified:

> Q [by counsel]      [] When you signed Exhibit 6[[5]], you believed
> that emergency care or treatment was
> required, correct?

---

[4] In her reply, defendant Harris objects to plaintiff's declaration in this regard, arguing that a party cannot create a genuine issue of material fact by an affidavit which contradicts the party's prior deposition testimony.  However, for the reasons stated by plaintiff in his opposition memorandum and at the telephone hearing on defendants' motions, the Court finds that plaintiff's declaration does not contradict his deposition testimony, but clarifies it.  (See Buchal Decl. Ex. 6 Nash Dep. at 164, 168; Buchal Decl. Ex. 1 Harris Dep. at 83.)  Defendant's objection is overruled.

[5] Harris deposition exhibit 6 is a "Notice of Mental Illness Emergency Hospitalization by a Physician," signed by defendant Harris.  (Buchal Decl. Ex. 2 Harris Dep. Exs. at 6.)

A [by Harris]      That's correct.

Q     And was emergency care or treatment needed to prevent physical harm to Dr. Nash?

A     What physical harm are you referring to?

Q     Any.

A     I don't understand what you are asking me.

Q     Was emergency care or treatment for mental illness necessary to prevent physical harm to Dr. Nash?

A     I believe that emergency care or treatment for the mental illness was necessary.

Q     Was it necessary to prevent physical harm to him?

A     I believe the patient was in need of emergency care and treatment for mental illness, period.

Q     With all due respect, I don't think you are answering the question.

A     Okay.

Q     Was this care necessary to prevent physical  harm to the patient?

A     I don't understand where physical harm plays a part in this.

(Buchal Decl. Ex. 1 Harris Dep. at 77-78.)  The only other evidence regarding

a finding of dangerousness by defendant Harris discussed by the parties and

found by the Court in its review of the record is defendant Harris' deposition

testimony as follows:

Q [by counsel]    What else besides information you received from the police would support a conclusion of dangerousness to self or others?

A [by Harris]    A mental status examination.

Q     What about the mental status examination supported that?

A     Excessive, pressured speech, anxiety, loose association, delusions, sense of persecution, poor cause and effect relationships, thinking errors, and inability to concentrate.

Q     Now, those are all recognized signs of dangerousness?

> A     Those are all signs of thought content which can lead to dangerousness.
>
> . . . .
>
> Q     Okay. So what you are saying is that there's some sort of content of Dr. Nash's thoughts that's not recorded in the records but which must have been there to support your finding of dangerousness?
>
> A     That's correct.

(Buchal Decl. Ex. 1 Harris Dep. at 71, 74.)

Also in the record is a "Notice of Mental Illness Emergency Hospitalization by a Physician" (NMI form) with plaintiff's name and signed by defendant Harris. (Buchal Decl. Ex. 2 Harris Dep. Exs. at 6.) Relevant to this issue, the Notice indicates that, the condition of plaintiff, as set forth, "caused" defendant Harris "to believe that the above-named person is dangerous to self or others because the person exhibits" certain indicators of imminent dangerousness. Handwritten on the form is "Pt threatened to shoot children at local elementary school. All Rogue Valley School Districts were closed as a result. Threatened to kill Ashcroft and President Bush." (Buchal Decl. Ex. 2 Harris Dep. Exs. at 6.) However, defendant Harris does not rely on this Notice in support of her argument that she made a finding of dangerousness. In her deposition testimony, she testified, in pertinent part, that her conclusion of dangerousness to self or others was "Absolutely not" based exclusively upon information received from the police, (Buchal Decl. Ex.

1 Harris Dep. at 71); in response to the question whether it was a fair statement to say that but for the police information about alleged threats made by plaintiff, defendant Harris would not have executed the NMI form and would have released plaintiff, defendant Harris testified: "That's a false statement. Mr. Nash was not admitted because the police brought him in and the police made allegations. Mr. Nash was admitted because his mental status examination showed significant abnormalities," (Buchal Decl. Ex. 1 Harris Dep. at 76-77); and that the role of the police information was to initiate a mental status examination, (Buchal Decl. Ex. 1 Harris Dep. at 82).

The Court finds that this evidence, when taken in the light most favorable to plaintiff, and in conjunction with plaintiff's evidence which raises a question whether defendant Harris examined plaintiff before ordering that he be held, would be sufficient to show that defendant Harris may not have known what the commitment statute required of her and/or that she did not fulfill the obligations imposed by the statute before committing plaintiff. Based on the arguments of the parties and the record before the Court, the Court finds that plaintiff's evidence raises a genuine issue of fact whether defendant Harris' actions were taken "pursuant to" ORS 426.232, or whether she acted on probable cause in committing plaintiff. Accordingly, defendant Harris' motion for summary judgment should be denied.

Findings and Recommendation - Page 21

Defendant Mercy Medical Center contends that <u>Deming</u> and <u>Scovill</u> confirm that it is immune from liability in the circumstances here, including plaintiff's assertion that the immunity statute is not available because Mercy failed to act.    It contends that plaintiff's cases concern court-ordered commitments and are, therefore, inapposite.   Mercy contends that Dr. Mendelson believed that plaintiff was dangerous to himself and needed active inpatient treatment during his admission at Mercy; Dr. Mendelson had probable cause to believe that plaintiff was dangerous to himself based on the nurses' reports of plaintiff's behavior, plaintiff's history, and Dr. Mendelson's own evaluation and assessment; it is entitled to immunity even though Dr. Mendelson's and/or the nurses' assessments were not correct; Dr. Mendelson had a good faith belief that plaintiff was dangerous and needed emergency care or treatment, as evidenced in the records; there is no legal basis for plaintiff's assertion of an objective good faith standard; most of the laws that plaintiff cites as evidence of Mercy's lack of good faith do not apply in the circumstances here; and Dr. Mendelson made the determination as to plaintiff's continued dangerousness, and he determined that plaintiff was dangerous to himself up until the point he was transferred from Mercy.

Pertinent to the question of whether defendant Mercy is immune from liability for actions taken pursuant to ORS 426.232 is the Oregon regulation

requiring a continuing assessment of dangerousness of a person on a hospital

hold.  OAR 309-033-0250 provides in pertinent part that:

> (5)  When a person in custody can be released.  A person
> shall [sic] who is detained, in custody, or on a hold shall be
> released as described:
> . . . .
> (c) Physician's release of a person on a hospital hold.  The
> treating physician shall release a person retained or admitted to
> a hospital pursuant to ORS 426.232, Hospital Hold, whenever
> the physician makes the determination that the person is not
> dangerous to self or others. . . .

It is undisputed that Dr. Mendelson received a call from a Mercy nurse on

October 19, 2003, reporting escalating behavior by plaintiff, including yelling,

chanting, banging on the window, threatening staff, and writing on the walls.

In support of its motion on this issue, Mercy offers the declaration of Dr.

Mendelson in which he states that he saw plaintiff on October 21, 2003, at

9:40 a.m. and, "Although [Mr. Nash] was still dangerous to himself and

unable to take care of his basic needs, I determined that he was safe to

transfer," and plaintiff was transferred to Rogue Valley Medical Center shortly

after noon.  (Mendelson Decl. ¶ 6.)  On this issue, plaintiff points to his own

declaration in which he declares that, "I was released from lockup by Dr.

Mendelson, who said, 'You don't belong in here.'  He later told me he would

release me outright, but I was on Jackson County hold, so I was being

transported back to Two North."  (Nash Decl. ¶ 32.)  Plaintiff argues that his

Findings and Recommendation - Page 23

sworn statement is corroborated by the notes of the licensed clinical social worker who stated "At this point, the patient will be returning to his home." (Buchal Decl. Ex. 11 at 2.)[6]  The Court notes that the notation by the social worker is not a determination by a physician that plaintiff was not dangerous to himself or others.  Taking plaintiff's evidence in the light most favorable to him, the Court finds that the evidence does not raise a genuine issue for trial. This evidence does not controvert Dr. Mendelson's determination on October 21, 2003, that plaintiff was "still dangerous" to himself.  (Mendelson Decl. ¶ 6.)

Plaintiff argues that defendant Mercy is not entitled to immunity for a number of reasons, including the assertion that Mercy did not act in good faith because it violated certain other regulations.  To the extent that any of the regulations cited by plaintiff apply in these circumstances, the Court finds that any alleged failures to comply with any or all of the regulations do not raise an inference that defendant Mercy did not act in good faith when Dr. Mendelson determined that plaintiff was still dangerous on October 21, 2003.

Under Deming, 128 Or. App. at 168, the Court finds that the immunity

---

[6] In another section of his opposition, plaintiff also cites Dr. Bursztajn's declaration as supporting a lack of evidence of dangerousness.  (Bursztajn Decl. ¶¶ 23-25.)  However, this evidence does not controvert Dr. Mendelson's determination, as stated in his declaration, that plaintiff was still dangerous on October 21, 2003.

provided by ORS 426.335(5) insulates any consequences of the performance of the protected actions.

On this record, the Court finds that defendant Mercy Medical Center is entitled to ORS 426.335(5) immunity from civil liability. Accordingly, defendant Mercy Medical Center's motion for summary judgment should be granted, plaintiff's state claims against defendant Mercy Medical Center should be dismissed, and defendant Mercy Medical Center should be dismissed from this case.

## IV. RECOMMENDATION

Based on the foregoing, it is recommended that defendant Harris' amended motion for summary judgment (#116) be denied, and that defendant Mercy Medical Center's motion for summary judgment (#118) be granted and all claims against defendant Mercy Medical Center be dismissed.

**This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter,**

**the parties have ten days within which to file a response to the objections.    Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.**

DATED this ___28___ day of February, 2007.

_____/s/_____
UNITED STATES MAGISTRATE JUDGE